NOTICE

Decision filed 03/27/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 170284-U

NO. 5-17-0284

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 10-CF-244 |
| | ) | |
| ESTIL Q. STAMPS, | ) | Honorable |
| | ) | Randall W. Kelley, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Overstreet and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held:* Because the defendant received effective assistance of trial counsel where trial counsel did, in fact, raise all defenses available to the defendant at the defendant's bench trial, we affirm the defendant's conviction and sentence for the offense of first degree murder.

¶ 2    The defendant, Estil Q. Stamps, appeals his conviction and sentence, following a bench trial in the circuit court of St. Clair County, for first degree murder. For the following reasons, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4    The facts necessary to our disposition of this direct appeal follow. On March 26, 2010, the defendant was indicted on a charge of first degree murder. The indictment

1

alleged that without lawful justification, and with the intent to kill or do great bodily harm to Fananza Beard (Nan), the defendant shot Nan in the head with a firearm, causing Nan's death, on or about March 4, 2010. The case proceeded to a jury trial, at which Willie Beard, Shontiza Brown (formerly known as Shontiza Goodwin), Elesae Howard, a number of law enforcement officers, and a forensic pathologist testified. The jury found the defendant guilty of first degree murder, and he was sentenced to 55 years in prison. This court reversed the defendant's conviction and sentence and remanded for a new trial because of a prejudicial error with regard to the instruction of the jury. *People v. Stamps*, 2016 IL App (5th) 130395-U, ¶¶ 61-63, 69.

¶ 5     Following remand from this court, the defendant, after a thorough admonishment, elected to proceed by a bench trial. The bench trial began on May 22, 2017, with the defendant represented by the same trial counsel as in his first trial, but before a different trial judge. In her opening statement, the defendant's trial counsel summarized what she expected the evidence to be, and then contended, *inter alia*, that "[a]t the conclusion of the case, you will not know any more about what happened outside that car than you do now at this point. Shontiza didn't see it. [The defendant] doesn't remember it. There's no way to know how this happened and who had the gun or who shot the gun or how it discharged."

¶ 6     The first witness to testify was Nan's mother, Willie Beard. Of significance to this appeal, she testified that Nan and Shontiza—who Willie referred to as "Shon"—had a baby together. When asked to describe Nan and Shontiza's relationship, Willie answered, "Violent." She then testified that both parties were violent, and when asked if alcohol was

2

involved, she testified, "All the time." She believed the relationship lasted "three, four years, or maybe more," and that they lived together for approximately "two or three years." Willie testified that on the day Nan died, Nan had been fishing. She testified that when she returned from getting medicine at a store, Shontiza and a man she subsequently identified as the defendant were at her home with Nan. She testified that the defendant was "walking up and down the living room to the kitchen" while Nan cleaned fish, and that the defendant "looked very frantic like." She testified that the defendant identified himself as Shontiza's uncle, and that she had never seen the defendant before. She testified the defendant was in her home "forty-five [*sic*] to an hour, somewhere around that time." She testified that she took Nan to a bedroom in the home and talked to him, because she didn't want him to go out, "because they fuss—they get to drinking, they getting to fighting and fussing and stuff like that." Willie testified that the defendant and Shontiza assured her everything would be fine. She testified that she could tell Nan had already been drinking, and she thought the defendant and Shontiza "smelled like they had" been drinking too.

¶ 7   Willie testified that at approximately 11p.m. that evening, she "was half asleep" in her bed when she got a telephone call from Nan, who she described as sounding "upset." Willie testified that Nan told her "they getting ready to get started," and that because she thought there was going to be a fight, she told him to "get out" of the car. She testified that after the call, she tried to go back to sleep but couldn't, and then received a second call from Nan. She again told him to get out of the car, and could hear Nan's voice as well as "cussing and going on." She testified that she believed Nan gave the phone to the

3

defendant, and that a voice she recognized as belonging to the defendant told her over the phone, "I'm getting ready to kill this MF." Willie explained that the defendant "didn't say 'MF,' he said the word." She testified, "then the phone just cut off." She testified that before the phone cut off, she could hear Shontiza in the background saying, "You going to get your 'A' whooped now."

¶ 8     On cross-examination, Willie conceded that at the defendant's previous trial, initially she had been unable to identify the defendant. She further conceded that in her initial interviews with the police she was not sure what the defendant had been wearing or what his car looked like. She also conceded that there were other inconsistencies between her direct examination testimony and her testimony at the previous trial, including with regard to how long her phone conversation with Nan was, and how long the defendant and Shontiza were at her home before leaving with Nan. On redirect examination, Willie testified that eventually she was able to identify the defendant at his first trial, and she discussed the inconsistencies in her testimony.

¶ 9     The next witness to testify was Chief Michael Hubbard of the East St. Louis Police Department. Hubbard testified that on the night Nan died, Hubbard was a patrol officer for the department. At approximately 11:58 p.m. that night, he was dispatched to 33rd and Bond in East St. Louis, for a call of "shots fired, man down." He was the first officer to arrive at the scene and "observed a black male subject, he was lying on his back *** appeared to be blood around his head area." He described the man—whom he later identified as Nan—as appearing to be "lifeless." After he secured the scene, Hubbard observed a man and a woman—whom he later identified as the defendant and Shontiza—

4

arguing approximately "thirty yards west of" Hubbard's location, with the man "trying to force the young lady into [a] vehicle." Hubbard testified that he sent Officer Kris Weston to investigate the pair. Hubbard testified that at the scene, he was subsequently shown a firearm that Hubbard described as a rusty revolver with a wooden handle.

¶ 10    Officer Kris Weston testified that on March 4, 2010, when he arrived at the scene of the shooting, he was directed by Hubbard "to make contact with the subjects who were seated in a dark-colored Buick that was on 33rd Street, kind of facing Bond." When he approached the vehicle, the male was in the driver's seat, and the female was in the passenger seat. He could not tell if either had been drinking. He spoke with the female, whom he described as cooperative but "hysterical, crying, screaming." He testified that a gun was found in the vehicle, but that a different officer, Officer Parks, found it. He observed Officer Parks find the gun under the driver's seat. He identified a photograph of the gun. He testified that he had noticed how "rusty-looking" the gun was. Weston testified that as he drove the woman—whom he identified as Shontiza—to the police department to make a statement, she said, " 'I thought he shot the gun in the air. I can't believe he shot my baby daddy.' " He identified the defendant as the male who had been in the car with Shontiza.

¶ 11    Special Agent Ben Koch of the Illinois State Police testified that he assisted in the homicide investigation. He testified that he interviewed the defendant twice. The first interview began at 12:18 p.m. on March 5, 2010. Koch testified that officers waited until that time to interview the defendant because of the defendant's state of intoxication at the time he was arrested. He testified that the defendant was no longer intoxicated when the

5

interview began. He agreed, with regard to the content of the interview, with the State's characterization "that the defendant remembered some of events of [the previous night] but claimed not to recall other events." The second interview was conducted on March 6, 2010. Koch testified that the purpose of the interview was to show the defendant a photograph of the gun that was found in his car, and to document any injuries the defendant may have had from the night in question. He described the only injuries to the defendant as being "preexisting and kind of old." Electronic video and audio recordings of both interviews were played for the trial judge. On cross-examination, Koch agreed that during the interviews, the defendant told Koch several times that the defendant did not remember shooting Nan, and "didn't remember if he did do it, what would have made him do it." Koch also agreed that the defendant told Koch that the defendant did not know how he ended up in custody, where he was when he was arrested, or other key details. On redirect examination, Koch testified that the defendant did not deny shooting Nan either.

¶ 12　Shontiza Brown testified that she had been in an "off and on" romantic relationship with Nan, and that they had a child together. She testified the relationship was sometimes "off" because they "fought a lot." She described Nan as "very jealous," stated that Nan drank a lot, and that she drank with him. She testified that on March 4, 2010, she and the defendant went to pick up Nan at Willie's house, where Nan was cleaning the fish he had caught that day. She testified that Willie told her not to let anything happen to Nan, and that she told Willie she wouldn't, and that they were just going out for a drink. Shontiza testified that they stayed at Willie's house for "maybe ten

6

or fifteen minutes," then left in the defendant's car. They first went to a house near "the south end" where they hung out with some of Nan's friends and coworkers, then went to Margaritas in Belleville. She testified that she and the defendant did not begin to drink until they picked up Nan, and that all of them drank after that.

¶ 13 Shontiza testified that when they arrived at Margaritas, Nan "was acting fine," but that he subsequently "started clowning when we was [*sic*] in there because he was calling me out my name." Because Nan continued "clowning," Shontiza told the defendant that they should leave Nan at Margaritas with Nan's other friends, but that the defendant let Nan come with them when they left Margaritas. She then testified, without interruption or objection, as follows:

> "And he clowned all the way to, we got up to, I think it's the bridge by St. Elizabeth's Hospital, and he got to clowning. So, we [*sic*] clowned all the way down till we got back to the city. He did. He argued. And I thought he was going to go home. I asked [the defendant] to take him home, but he didn't want to go home. And that's when, that's when they just was [*sic*] really, well, it was him really arguing because he kept calling me out my name. And [the defendant] told him don't be calling me out my name like that, you know. And that's when, that's when they pulled over, because Nan was sitting behind [the defendant] and he was pistol playing him. He acted like he had a pistol in his hand. Normally, he, he don't [*sic*] even carry one. But after that, that's when I just thought it was just going to be an argument because he argued with everybody. So, I'm just sitting in the car, and they got out, and I just thought they was [*sic*] just having words."

7

Shontiza thereafter clarified that calling her out of her name meant calling her curse words. She testified that Nan did that when he was drinking. She testified that she didn't want the defendant to let Nan leave Margaritas with them because Nan "started clowning in there, he was going to really start clowning." She testified that the arguing between Nan and the defendant "escalated all the way back down to when we got back in the city." Shontiza testified that when they reached Bond Street, Nan and the defendant "got to arguing, and that's when he was sitting behind [the defendant,] behind him like he had a gun and pistol playing." She testified that the defendant stopped the car because Nan "basically kept arguing with" Shontiza and calling her names, and that the defendant kept telling Nan to stop calling her names. Shontiza testified that was when Nan "acted like he had a pistol, which I didn't—I wonder why would he do that." She testified Nan and the defendant got out of the car, and that she thought they were "going to fight or have some words." When asked to clarify what she meant by "pistol playing," Shontiza testified that Nan "had on his jacket and he was behind [the defendant's] head, and he had his hand in his jacket like he had a pistol." She testified that Nan knew Nan didn't really have a pistol, which is why she called it "pistol playing." She never saw a gun in Nan's hand, and to her knowledge Nan did not own a gun. She did not see a gun in either man's hand when they exited the car. She ignored the men and listened to the radio, until she heard a gunshot. She testified that the defendant got back into the car, and she said " 'I know you didn't—I know you didn't shoot him,' or whatever." She testified that she could not remember if the defendant had a gun when he got back into the car, and added, "I didn't even know [the defendant] had a gun in the car on him. I didn't even know he had a gun."

8

She was then asked, "But you didn't see one on him then?" She answered, "No, I didn't."
When asked how the defendant responded to Shontiza's statement about shooting Nan, Shontiza testified, "Well, he said something to the effect that, 'That's what he get.' "

¶ 14   Shontiza testified that she asked the defendant to leave the scene, which they briefly did. When they returned, she got out of the car and went to where Nan was lying on the ground. Then, the police arrived. She was taken to the police station, where she gave a statement. Shontiza testified that she was "upset" and "shaken up *** emotionally" after the shooting. When asked about Nan's jealousy and whether Nan was accusing her "in a jealous manner that night," she testified, "No. No, he—it's just like when me and him like drink together, he just—for no reason at all, I guess, it would be the alcohol."

¶ 15   On cross-examination, Shontiza testified she had known the defendant since her "early twenties," that he was a family friend, and that she and the defendant had never been in a romantic relationship. She conceded that in the past she had both verbal and physical altercations with Nan, which involved alcohol, and which resulted in police intervention. She agreed that on March 4, 2010, she, Nan, and the defendant were all drinking, and that Nan "was very intoxicated that night." When asked if, on the way home from Margaritas, Nan said he was going to shoot the defendant in the back of the head, Shontiza testified, "You know, it happened so fast, but he—he was saying something. I don't remember, because I was like brushing it off. But I do remember him with his hand, like he had something in his hand, like he was pistol playing." She agreed she "probably" told the police during her interview that Nan had threatened to shoot the

9

defendant in the back of the head, but that she knew Nan did not really have a gun. She admitted that at the defendant's first trial, she had testified that she could not remember if the defendant said anything after returning to the car. She testified that she may have made inconsistent statements to the police because of how much she had been drinking that night, which affected her memory of the night. She agreed that it was "fair to say" that she was "not sure exactly what [the defendant] may have said" about the shooting, or where the defendant was when he said it. She also agreed she had not seen the defendant with a gun at all that night, and that the shooting happened very soon after the car stopped and the men got out. She agreed that she had not seen who was holding the gun when it "went off." When asked if there could have been a struggle over the gun that caused the gun to discharge, Shontiza testified, "I didn't—I didn't see, so I don't know. I can't say." She conceded it was a possibility.

¶ 16   Additional law enforcement witnesses testified, as did a forensic pathologist, mostly as to details that are not at issue in this appeal. The undisputed testimony of these witnesses, in summary, was that (1) Nan died of a single gunshot wound to his left eye, with the bullet projectile traveling "slightly upwards and towards the right side, or inward," (2) no fingerprints were discovered on the gun found in the defendant's car that were suitable for determining who had touched the gun, (3) a lead fragment found in Nan's head was fired from the gun found in the defendant's car, (4) gunshot residue tests performed on both the defendant and on Shontiza were inconclusive as to whether either had fired a gun, and no gunshot residue test was performed on Nan's body or clothing, (5) fresh injuries found on Nan's body—in particular, his fingers—were consistent with

him being involved in "some kind of altercation or something like that," (6) the gunshot that killed Nan was fired from approximately "less than one and a half feet" away, but the gun was not "up against" or "pressing on" Nan's head, and (7) Nan's blood alcohol content at the time of his death was .260.

¶ 17 After the State rested its case, the defendant's trial counsel moved for a directed verdict of acquittal, contending the State's evidence was not sufficient to find the defendant guilty beyond a reasonable doubt; in particular, counsel claimed the State had not met its burden "to prove that [the defendant] performed the acts that caused the death of" Nan. The motion was denied. The defendant declined to testify or otherwise present evidence, and the bench trial proceeded to closing argument. The State noted, *inter alia*, the testimony of Willie that she had received a phone call in which the defendant stated that he was "getting ready to kill" Nan, and the fact that although the defendant did not admit to shooting Nan, he also did not deny that he shot Nan. The State also noted that although the defendant stated that he did not remember the shooting, he remembered many other details of the night, and apparently was able to drive his car successfully to various places. The State characterized the defendant as having "convenient amnesia."

¶ 18 In her closing argument, the defendant's trial counsel contended that based upon the evidence presented by the State, it was still unknown what happened "outside the car at *** 33rd and Bond." She argued that Shontiza had admitted that although she did not believe Nan had a gun, Nan might have "found a gun in the car at some point during that evening," and might have been in possession of the gun while threatening to kill the defendant. She argued that Shontiza did not hear the defendant threaten to kill Nan, and

11

did not see either man with a gun, and that Shontiza's various statements on several points were inconsistent because Shontiza had been drinking a lot that night too. She also pointed to problems and inconsistencies with Willie Beard's testimony, and described the defendant as cooperative with the police, but essentially unable to help them because he could not remember the events of the night either. She argued that "[t]he fact that he doesn't remember is not proof that he shot [Nan]. The State has to prove that beyond a reasonable doubt." She next argued that the State had "not eliminated the possibility that [Nan] had located the gun in the car, got out and then the gun went off during either a struggle for the gun or just accidentally because of his intoxicated state," and reminded the trial judge that it was unknown "whose hands were on that gun when the shot went off." She pointed out that in light of the close range at which the fatal single gunshot was fired, Nan could have "had it in his hand when it went off and accidentally set it off." She posited that in light of the fact that the defendant might not have been "in control of the gun when it went off" and possibly was not the one who brought the gun out of the car, the defendant could not be guilty of first degree murder. She also posited that even if the defendant did state that he was going to kill Nan, because of the defendant's drunken condition, the defendant may have lacked the requisite intent to commit first degree murder, because "[p]eople say things they don't mean when they're under the influence of alcohol."

¶ 19   In reply, the State argued that if Nan had been the one who brought the gun out of the car, having found it at some point in the evening, the defendant would not have brought it back to the car and placed it under the seat, where it was found by the police.

12

The State also reminded the trial judge that the defendant had been able to drive away from the scene and return, without wrecking his car, which undermines the proposition that he was so severely intoxicated when the shooting occurred that he would have no memory of it, or that he would be unable to form the intent to commit first degree murder. The State further argued that its burden was to prove the defendant guilty beyond a reasonable doubt, not beyond all doubt, and that the State believed it had met that burden.

¶ 20 Thereafter, the trial judge announced that he was going to recess court to "review [his] notes and all the evidence and the testimony." Later that afternoon, he rendered his verdict, first making, *inter alia*, the following findings of fact: (1) "that the defendant and [Nan] were clearly arguing during the course of the evening," (2) "clearly [Nan] had threatened acts against the defendant and argued with the defendant," (3) the defendant and Nan "left the car arguing," (4) the gun that fired the projectile that killed Nan was found on the driver's side of the defendant's car after the defendant returned to the car, and (5) "the defendant was able to form the requisite intent to commit this offense in spite of any allegation or claim of intoxication." The trial judge concluded, therefore, that the State had met its burden to prove the defendant guilty, beyond a reasonable doubt, of first degree murder, by proving all the necessary elements of the offense.

¶ 21 On June 19, 2017, the defendant filed a motion for a judgment notwithstanding the verdict, or, in the alternative, a new trial. Therein, the defendant contended, *inter alia*, that (1) there was not sufficient evidence to convict the defendant, beyond a reasonable doubt, of first degree murder, and (2) a directed verdict should have been entered for the

13

defendant at the close of the State's case. On June 26, 2017, a hearing was held. With regard to the defendant's motion, the trial judge denied it, stating that the defendant's trial counsel "on behalf of her client offered a very viable and well-presented defense; nevertheless, the court determined upon consideration of the testimony and evidence that the State had proved the defendant's guilt of the offense of first degree murder beyond a reasonable doubt." He added that he "believe[d] that as stated at the time of the pronouncement of the verdict, that the State's evidence was more than sufficient to convict the defendant of this offense."

¶ 22 The trial judge, with the consent of the parties, then proceeded to the sentencing of the defendant. When asked if she wished to present evidence in mitigation, the defendant's trial counsel stated, "No evidence, your honor, just argument." After the State argued for a sentence of 55 years (which included the mandatory 25-year firearm enhancement), to be served at 100%, the defendant's trial counsel began her argument, pointing out that the defendant had no history of convictions for crimes of violence, and at one point stating as follows:

"The court can also consider other factors that don't rise to the level of a legal defense but would tend to excuse or justify his conduct. In this case, we think that the court can take into consideration the fact that [Nan], according to the testimony that you heard, was pistol playing with [the defendant] on the ride from *** Margaritas to East St. Louis, threatening to shoot him in the back of the head. While we don't think that rose to the level of a legal defense and the fact that [the defendant] was unable to remember some of these parts of this evening because of

14

the fact that he had been drinking so heavily, but we do think that the court can consider that as a factor in mitigation, even though [the defendant] was unable to present any testimony along those lines because of his alcohol—lack of memory caused by the alcohol."

¶ 23    Thereafter, the trial judge gave the defendant the opportunity to make a statement in allocution, which the defendant declined. The trial judge then discussed in general the required severity of penalties when a firearm is involved in an offense in a case such as this one, and, with regard to the defendant's opportunity to make a statement in allocution, the trial judge stated that had the defendant made one,

"I'm sure he would have suggested a feeling of remorse that any of this ever happened and the feeling that he in many ways, if not having been influenced by the alcohol and not having believed he was needing to protect and/or right a wrong that was being conducted against Shontiza, that this wouldn't have happened."

With regard to mitigation, the trial judge stated that although he acknowledged that he could not "get into [the defendant's] mind that night, and particularly his alcohol-persuaded mind," the trial judge nevertheless could not

"believe that this didn't happen in part because of the conduct of [Nan] himself, no conduct which should have resulted in his death certainly, but conduct that when there's a gun around, bad things can happen and if you act the wrong way or act in a possibly foolish or again alcohol-induced way, bad things can happen."

¶ 24    The trial judge then accepted the recommendation of the defendant's trial counsel and sentenced the defendant to the minimum permissible sentence of 20 years of

15

imprisonment on the conviction for first degree murder, with 25 more years added to the sentence because of the firearm enhancement. The entire sentence of 45 years was to be served at 100% and followed by 3 years of mandatory supervised release. This timely appeal followed.

¶ 25                                II. ANALYSIS

¶ 26    On appeal, the defendant contends that during his second trial, he received ineffective assistance of trial counsel and was prejudiced thereby. In particular, the defendant posits that trial counsel "abandoned the defenses of justification and imperfect self-defense due to the mistaken belief that [the defendant's] memory loss was a legal bar to the defenses." In support of this proposition, the defendant points for factual support to the trial judge's statement that Nan "clearly" threatened the defendant prior to the shooting, and posits that trial counsel should have, but did not, raise justification and imperfect self-defense as affirmative defenses. For legal support, the defendant notes that the defendant's memory loss was not a bar to the defenses in question, because Illinois law allows affirmative defenses to be raised by the State's evidence, and in this case Shontiza's testimony on direct examination by the State supported the defenses. In terms of the prejudice required to prevail on an ineffective assistance of counsel claim, the defendant essentially contends the evidence was closely balanced as to whether the killing of Nan was first degree murder, a lesser offense, or no offense at all.

¶ 27    The State, on the other hand, contends, *inter alia*, the evidence produced at the defendant's trial "did not support a theory of self-defense," and that therefore the defendant's trial counsel could not be ineffective for failing to argue the theory. In

16

support of this proposition, the State contends "the trial evidence was such that the State could easily disprove any affirmative defense beyond a reasonable doubt." The State also notes that the remarks of trial counsel that appellate defense counsel focuses on to show "abandonment" of defenses actually took place at the June 26, 2017, sentencing hearing, not during the defendant's second trial, which took place in May 2017.

¶ 28 In reply to the State's arguments, the defendant contends, *inter alia*, that the question at this point in the proceedings is not whether this court would defer to a finding of fact that such defenses failed (because, he contends, no such finding was made), but whether there was sufficient evidence for the defenses to be presented to the trial judge. The defendant posits that the key "question is whether trial counsel gave up a viable defense theory based on a failure to appreciate that Shontiza's statements made that theory available," in light of the fact that in this case, "the evidence of intent was scant, but the circumstantial evidence that [the defendant] had the gun was powerful."

¶ 29 We first note that we do not agree with the defendant's proposition that, as a factual matter, his trial counsel "abandoned" defenses that were available to him. It is upon this alleged "abandonment" that the defendant's ineffective assistance of counsel claim is based; because we find no such "abandonment" occurred, we find there is no factual basis for the ineffective assistance of counsel claim. Although the defendant points to comments made by trial counsel at his sentencing hearing to support his proposition, it is, of course, the arguments made by trial counsel at the bench trial, prior to the trial judge's verdict, that are of significance. At that time, before the defendant had been found guilty of first degree murder, trial counsel, in her closing argument, laid out

the various theories under which she believed the defendant should be found not guilty of first degree murder. As recounted above, she argued, *inter alia*, that Shontiza had admitted that although she did not believe Nan had a gun, Nan might have "found a gun in the car at some point during that evening," and might have been in possession of the gun while threatening to kill the defendant, an argument that was clearly designed to invoke justification, self-defense, or imperfect self-defense. She added that the State had "not eliminated the possibility that [Nan] had located the gun in the car, got out and then the gun went off during either a struggle for the gun or just accidentally because of his intoxicated state," and reminded the trial judge that it was unknown "whose hands were on that gun when the shot went off." Clearly, trial counsel's insinuation that there might have been a struggle for the gun—with the gun beginning in Nan's possession—was a further attempt to invoke justification, self-defense, or imperfect self-defense, as well as to invoke the defense that the shooting was accidental and therefore unintentional. Trial counsel also argued that in light of the close range at which the fatal single gunshot was fired, Nan could have "had it in his hand when it went off and accidentally set it off." She posited that in light of the fact that the defendant might not have been "in control of the gun when it went off" and possibly was not the one who brought the gun out of the car, the defendant could not be guilty of first degree murder. These arguments, too, were clearly intended to invoke defenses of justification, self-defense, or imperfect self-defense, as well as to attempt to convince the trial judge that it was possible that Nan accidentally shot himself, with the defendant not having touched the gun outside of the car until he took it back to the car and placed it where the police found it. In addition, she

18

argued that even if the defendant did state that he was going to kill Nan, because of the defendant's drunken condition, the defendant may not have meant what he said, and may have lacked the requisite intent to commit first degree murder, implying the shooting still could have been accidental (and therefore unintentional), or once again could have been justified as an act of self-defense or imperfect self-defense, because it may have happened during a physical struggle not initiated by the defendant, his previously-expressed desire to harm Nan notwithstanding, and regardless of who brought the gun out of the car.

¶ 30   It is true that the defendant's trial counsel did not use the legal terms of art "justification," "self-defense," or "imperfect self-defense." But this was a bench trial, rather than a jury trial. Accordingly, trial counsel was arguing her theories to a judge, not to a jury untrained in the law and therefore in need of instruction as to the law. It is well-established that when reviewing the results of a bench trial, this court presumes the trial judge both knew and followed the law, a presumption that is rebutted only if the record affirmatively shows otherwise. See, *e.g.*, *People v. Ressa*, 2019 IL App (2d) 170439, ¶ 31. In this case, the record does not affirmatively show otherwise. The defendant's multiple theories, described above, were clearly before the trial judge. The trial judge recessed the court to "review [his] notes and all the evidence and the testimony." The findings of fact that he made when he thereafter rendered his verdict, outlined above, show that he considered the impact of the arguing that took place between the defendant and Nan, and the impact of the fact that Nan "clearly" had threatened the defendant, when deciding whether the defendant was guilty of first degree murder. He also

19

considered the question of whether the defendant was so intoxicated that he could not form the requisite intent to commit first degree murder.

¶ 31 The record also shows that a month after the trial, at the sentencing hearing, the trial judge described the defense provided at trial as "very viable and well-presented," further evidence that the multiple theories presented by the defendant's trial counsel in closing argument were not somehow "missed" by the trial judge, and were not "abandoned" by trial counsel. Nevertheless, the defendant takes issue with the following statements by trial counsel at the sentencing hearing, contending they demonstrate that at the trial, trial counsel "abandoned" defenses available to the defendant:

"The court can also consider other factors that don't rise to the level of a legal defense but would tend to excuse or justify his conduct. In this case, we think that the court can take into consideration the fact that [Nan], according to the testimony that you heard, was pistol playing with [the defendant] on the ride from *** Margaritas to East St. Louis, threatening to shoot him in the back of the head. While we don't think that rose to the level of a legal defense and the fact that [the defendant] was unable to remember some of these parts of this evening because of the fact that he had been drinking so heavily, but we do think that the court can consider that as a factor in mitigation, even though [the defendant] was unable to present any testimony along those lines because of his alcohol—lack of memory caused by the alcohol."

We do not believe these statements indicate that trial counsel was "abandoning" anything. At this point in the proceedings, she had made her arguments at trial about what

20

she believed the evidence showed—only to have her position rejected by the trial judge—and had raised the issue of the sufficiency of the evidence as to first degree murder again in her posttrial motion, only to have her position rejected by the trial judge once again. To us, her statements at sentencing represent the pragmatic recognition that although she could no longer viably contend to this trial judge that the facts of the case presented legal defenses sufficient to escape a conviction for first degree murder, nevertheless she could present those same facts, in mitigation, in an attempt to lessen the defendant's sentence. She was successful, garnering a sentence for the defendant that was 10 years shorter than the one requested by the State, and the one he received after his first (albeit flawed) trial. Indeed, prior to sentencing the defendant, the trial judge specifically noted, in mitigation, that he could not

> "believe that this didn't happen in part because of the conduct of [Nan] himself, no conduct which should have resulted in his death certainly, but conduct that when there's a gun around, bad things can happen and if you act the wrong way or act in a possibly foolish or again alcohol-induced way, bad things can happen."

¶ 32    In sum, we agree with the defendant that in light of the way he has presented his contention of error in this appeal, the key "question is whether trial counsel gave up a viable defense theory based on a failure to appreciate that Shontiza's statements made that theory available," in light of the fact that in this case, "the evidence of intent was scant, but the circumstantial evidence that [the defendant] had the gun was powerful." However, for the reasons discussed above, we conclude there is no basis in the record to believe trial counsel gave up any defense theories; to the contrary, she vigorously pursued

21

multiple ones in an effort to save the defendant from a finding of guilt for first degree murder. The fact that she could not convince the trial judge does not mean she did not attempt to do so, and the fact that she did not phrase her arguments in the exact manner appellate counsel would have phrased them does not mean she failed to bring her contentions to the attention of the trial judge in an adequate manner. To the contrary, we believe she did bring her contentions to the attention of the trial judge in an adequate manner, and we reiterate that when we review the results of a bench trial, we presume the trial judge both knew and followed the law, a presumption that is rebutted only if the record affirmatively shows otherwise. See, *e.g.*, *Ressa*, 2019 IL App (2d) 170439, ¶ 31. We note as well that this court has relied upon the foregoing presumption to hold that the mere fact that a trial judge did not expressly note each aspect of the judge's analysis of an issue does not demonstrate sufficiently that the judge did not consider each aspect. *People v. Parrott*, 2017 IL App (3d) 150545, ¶ 28. Accordingly, we conclude there exists no factual basis for a claim of ineffective assistance of counsel in this case, under these circumstances.

¶ 33 Moreover, the defendant has not argued, in the alternative, that the evidence presented at the defendant's bench trial was insufficient to support the trial judge's finding that the defendant was guilty of first degree murder. Accordingly, the defendant has forfeited consideration of such a claim. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). However,

22

even if the claim had been raised, it would have failed, which means the defendant has not been prejudiced by this forfeiture. The claim would have failed because this court, when faced with a sufficiency of the evidence claim, "will not reverse a guilty verdict unless the evidence, viewed in the light most favorable to the prosecution, was so palpably contrary to the verdict, so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *Ressa*, 2019 IL App (2d) 170439, ¶ 42. In this case, the evidence, described in detail above, was sufficient to support the trial judge's conclusion that the defendant committed first degree murder, and was not so impaired by alcohol that he could not form the requisite intent to do so. There is nothing about the evidence, viewed in the light most favorable to the prosecution, that is so palpably contrary to the verdict, so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. Furthermore, it is not the province of this court to substitute our judgment for that of the trial judge with regard to issues of the credibility of the witnesses or the weight of the evidence, because it is axiomatic that "it is not the function of this court to retry the defendant." *Id*.

¶ 34                                    III. CONCLUSION

¶ 35    For the foregoing reasons, we affirm the defendant's conviction and sentence.


¶ 36    Affirmed.